(No. 3290 ▮▮▮▮)

HARTMANN-CLARK BROS. COMPANY, A CORPORATION, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed November 12, 1947.*

*Petition of Claimant for rehearing denied December 18, 1947.*

DENT, WEICHELT AND HAMPTON; HODGES AND TRAGETHON, and E. V. CHAMPION, for Claimant.

GEORGE F. BARRETT, Attorney General; GLENN A. TREVOR, WILLIAM L. MORGAN, WILLIAM J. COLOHAN, Assistant Attorneys General, for Respondent.

ECKERT, C. J.

During the year 1932, claimant, a general building contractor, having its principal office at Peoria, Illinois, entered into a series of nine contracts with the State of

Illinois, for the construction of certain concrete highways. Under the terms of these contracts the respondent agreed to furnish the necessary cement. Claimant thereafter began work, supplying, transporting, and installing the necessary machinery, tools and equipment at the situs of the work; securing workmen and laborers, and perfecting an organization in connection with each contract until it was forced to suspend operations because of respondent's failure to supply cement. Claimant alleges that this failure interrupted and delayed the prosecution of claimant's work; that it prevented claimant from completing its work in an orderly, usual, and economical manner, and in sequence; that it caused claimant's men and equipment to remain idle; and that it compelled claimant to pay an increased cost of gasoline, materials and labor. The total damages claimed are in the amount of $137,649.92.

The contracts provided that the work be done according to the Standard Specifications for Road and Bridge Construction of the Division of Highways, adopted January 2, 1932. Work was begun on six of the contracts in the fall of 1932, and was suspended in November and December when all work was shut down for the winter season. During the month of February, 1933, respondent notified claimant to file requisition for cement requirements on this projects not later than March 1st, and claimant accordingly thereafter filed requisitions for cement, requesting delivery by April 10th to April 14th. Claimant was ready to proceed with the paving work at that time, and in two instances two adjoining contracts were to be worked with the same paving units and equipment. The cement, however, was not made available to claimant when requested, and was not furnished until the 26th of June for three contracts,

not until the 28th of June for three other contracts, and not until the 7th of July for two contracts.

From the time claimant was ready to proceed with the paving, until the cement was available, all of claimant's equipment and organization were idle. Continued requests were made of the respondent during that period, and conferences were had between claimant and the Division of Highways. Claimant alleges that as a result of respondent's failure to furnish cement as and when requested, claimant's equipment and organization remained idle a total of 310 days. The fair rental value of this equipment, based upon the schedule of Equipment Ownership Expense, published by the Associated General Contractors of America, would be $63,990.34.

Another element of damage alleged by claimant is general overhead amounting to $38,753.10. This amount was determined by computing its overhead for the year 1933, which, based on an eight month construction season, amounted to $15,001.75 per month. This was divided among four paving units, amounting to $3,750.44 per unit, or a total expense of $125.01 per paving unit per day.

Claimant also alleges a loss of profits which it contends it could have earned during the period of idleness. This was found by taking the average profit for the preceding six years, which, based on an eight month construction season, and allocated to four units, amounted to $53.39 per day per unit, or a total of $16,550.90.

Other damages sought by the claimant consist of the following items:

Transporting paving unit to Altamont, Illinois, at the direction of respondent..........................................$   884.21
Maintaining night watchman................................   124.61
Moving paving unit to Marshall County.....................  1,628.14
Rented equipment idle from April 14th to June 20th, 1933....  3,666.89
Maintaining skeleton crew during delay.....................  2,022.61

Cost of cleaning brick..................................... 209.04
Equipment rental, R. Balton during delay.................. 2,557.20
Increased cost of labor-wage scale........................ 2,659.74
Increased cost of gasoline................................ 2,645.86
Increased cost of paving due to winter operations.......... 424.90
Cost of straw curing method made necessary due to delay in
   furnishing cement .................................... 972.57

                                                $17,795.77

In its answer, the respondent has alleged that during January 1933, "as a result of the persistent collusion by cement producers and others to impose exorbitant prices for cement and to induce and cause collusive bidding," respondent by "executive order" refused to accept bids on cement; that it was not until June 15, 1933, that the respondent was able to procure cement through competitive bidding; that the conspiracy and collusion by cement producers and others prevented the State from obtaining and delivering cement to the claimant; and that the State of Illinois, as a sovereign commonwealth, is not liable to claimant in damages for any delay caused by such executive order, or its failure to deliver cement to claimant during the periods complained of.

The claimant contends, however, that the respondent presented no evidence of any "collusion" or "conspiracy", and presented no evidence that the respondent was prevented from delivering cement to claimant during this period. Claimant contends that the evidence shows that there was abundant cement in the market; that the companies were overstocked; that the price of bids was fair and in line with the then commercial market; and that the bids protected the State against any increase during the year.

At the hearing before Commissioner Blumenthal, Robert Kingery, former Assistant and Acting Director

of the Department of Public Works and Buildings, testifying on behalf of the respondent, stated that on January 20, 1933 the respondent advertised for bids returnable February 27th; that seventeen companies submitted bids, and that the bids received were uniform at an average statewide bid of $1.62 per barrel at point of delivery; that he had a conference with Mr. Lieberman and Mr. Hathaway, Engineer of Construction, to discuss what action should be taken; that it was agreed that they would reject the bids, but took the matter up with Governor Horner; that he told the Governor at that conference that the bids were 68c per barrel higher than the bids in 1932, but that during the preceding year there had been what was known as a "cement war," and that the companies bidding in 1932 had bid prices which were, in his judgment, lower than the cost of cement; that he thought a fair price might be somewhat over $1.25 per barrel, but considered $1.62 out of line; that the Governor asked what his recommendation was, and that he recommended the bids be rejected and that the Governor told him to reject "those bids." Accordingly, he rejected the bids, and advertised for new bids, returnable March 27th, 1933.

The new bids were likewise $1.62 per barrel, and were again uniform. The same procedure was followed, and the bids were again rejected. It was then decided to advertise for bids for cement f.o.b. at the factory, returnable April 12th, 1933. The same bids were received as those for delivery at destination. Another conference was had with the Governor, and he directed these last bids be rejected as they were irregular. This was done.

Thereafter, Mr. Kingery arranged with three professors of the University of Illinois to make a study of

the cement situation. They visited cement plants in Pennsylvania, Indiana and Illinois, and with the full co-operation of the cement companies, obtained factual records for a report to the Governor as to the cost of manufacturing cement. About June 15th or 16th, the respondent contracted for the purchase of cement with the Marquette Cement Company, at a price, Mr. Kingery testified, that was lower than the previous bids, and was for less than two-thirds of the required amount.

The record contains evidence as to the cost per barrel of cement to the state each year from 1919 to 1933, and considerable evidence as to conditions in the cement market during the years 1932 and 1933. This evidence, obviously, was intended to indicate that the action of the Department of Public Works and Buildings, and the action of Governor Horner, were warranted by the facts. Neither the wisdom of the Governor, nor the wisdom of the Acting Director, however, is for determination by this court. It is neither necessary nor proper to question the judgment of the Governor or of the Acting Director; no suspicion of bad faith on the part of either state officer is suggested by the record.

It is likewise clear that claimant was guilty of no default or breach, and was ready, willing and able to complete performance of its contracts; that it was unreasonably delayed in so doing by failure of the State to perform. When a claimant thus sustains a loss through no fault of its own, but occasioned solely by the State, the State is liable for the actual damages sustained. (*The Strandberg Brothers Company, A Corporation,* vs. *State of Illinois,* 8 C.C.R. 87; *The Carson-Payson Company* vs. *State of Illinois,* 8 C.C.R. 581; *Willadsen, et al.* vs. *State of Illinois,* 8 C.C.R. 604; *Belding* vs. *State of Illinois,* 12 C.C.R. 438.)

The respondent contends, however, that when the State, in the interests of the general public, delays the furnishing of cement because it believes that cement contractors are demanding excessive prices, it is justified upon the grounds of public policy, acts within its sovereign rights, and is not liable for damages resulting from such delay. This defense rests upon the principle that the rights of the general public must prevail over any rights of an individual, and was stated by this court in the cases of *J. P. O'Keefe Company* vs. *State of Illinois,* 10 C.C.R. 480, and *Madison Construction Company* vs. *State of Illinois,* 11 C.C.R. 64.

The claim in the *O'Keefe case* was in three parts: the first item was for additional compensation for stone excavation; the second item was for delay caused by the failure of a private corporation to furnish and maintain adequate equipment; and the third item was for delay in furnishing cement. The delay in furnishing cement in that case arose out of the same facts as the delay in this case. The court there said: "It was a matter of common knowledge that the cement producers were demanding exorbitant prices from the State for cement. The people of the State of Illinois were vitally interested. It might well be assumed that cement manufacturers knew that the State had agreed to furnish cement to numerous contractors, and that contracts were then in existence for public improvements which the State had entered into. It also might well be assumed that the public officials of the State of Illinois, through its Chief Executive, the Governor of the State of Illinois, rightfully felt that the action of the cement manufacturers or dealers was such as to make those public improvements so costly as to be prohibitive and against public policy."

The court then discussed the meaning of "public policy", and concluded that: "The exorbitant price demanded by cement manufacturers affected the whole State of Illinois, and it must be conceded that such action was injurious to the public. This claim for damages arising from the fact that the State could not furnish cement must be denied on the grounds of public policy.

"It may be contended that in repudiating any liability on behalf of the State for its failure to furnish cement under the circumstances in this case is an unconscionable act. The answer to this is that in a situation of this kind the interest of the public, rather than the equitable standing of individual parties, is of determining importance, and we base our opinion upon principles of public policy and to conserve the public welfare."

The claimant here, however, contends that although it is clear that O'Keefe was not entitled to recover for delay in furnishing cement, because of his own default, this court, in its opinion, went further than was necessary, and commented upon matters not raised by the pleadings or brought out by the evidence. Claimant contends that that part of the decision which discusses the State's failure to supply cement is *obiter dicta*. A careful reading of the opinion, however, indicates that the liability of the respondent for failure to furnish cement was clearly at issue, and that the liability of the respondent was denied by the court on the ground that the respondent acted within its sovereign rights when it delayed the furnishing of the cement in the interests of the general public.

The *Madison Construction Company case* is likewise in point. Under the contract in that case the State was to furnish the cement necessary for the improvement in

question; upon completion of all necessary preliminary work the claimant requested the respondent to furnish cement in accordance with the contract; the respondent authorized the claimant to procure the necessary cement, but subsequently withdrew its authorization, so that the claimant was compelled to suspend operations from April 27, 1933 to June 27, 1933. An award was denied on the ground that claimant, by accepting final payment had released the respondent from all claim for damages. A rehearing was granted, and in the opinion on rehearing the court followed the decision of the *O'Keefe case.*

The court there said: "It appears from the record in this case that the State had entered into a contract with the claimant at a time when the price of cement was satisfactory to all concerned, and as we understand it, it is common practice to let contracts of this character at various seasons of the year, and at times when the contract is not to be performed for several months. The questions here presented are of much importance for those reasons. The exorbitant prices demanded by cement manufacturers affected the whole State of Illinois. This claim for damages arising from the fact that the State could not furnish cement could, therefore, be denied on the grounds of public policy."

After discussing cases in which the rights and duties of a sovereign were involved, the court said: "Basing our conclusions on the language of the Supreme Court of the United States in the *Horowitz case, supra, (Horowitz* vs. *United States,* 267 U. S. 458, 69 L. Ed. 736), we must hold that when the State of Illinois is sued as a contractor on a contract entered into by the Highway Department, it can not be held liable for an obstruction to the performance of a particular contract, resulting from

its public and general acts as a sovereign." The claim was accordingly denied.

Claimant, however, contends that the *O'Keefe case* and the *Madison Construction Company case,* if in point, should be overruled; that the decisions in those cases are erroneous because there as here, there was no proclamation or executive order. It is true, there was no formal written order or proclamation by the Governor, but it is equally true that the Governor ordered the Director of the Department of Public Works and Buildings to reject bids, and that pursuant to such direction the bids were rejected. The mere existence or absence of a formal document is certainly not the test for determining the validity of the official action. If such act of the official in whom was vested the supreme executive power of the State was authorized, it is immaterial whether it was written or verbal in the absence of a constitutional or legislative provision prescribing documentary authentication.

But claimant, further contends that even if such executive order had been issued, the Governor was without any legal power or authority to take such action and thereby impair the contractual obligation in violation of Art. II, Sec. 14 of the Constitution of Illinois, or thus to deprive claimant of his contractual rights without due process of law in contravention of the Fifth Amendment to the Constitution of the United States.

The legal principle set forth in the *Horowitz case, supra,* is the answer to this contention. It is there stated: "It follows, therefore, that when the United States appears as a contractor it cannot be held liable for an obstruction to the performance of its contract resulting from its public and general acts as sovereign whether legislative or executive."

It follows, therefore, that the question in this case, as in the *O'Keefe case* and the *Madison Construction Company case* is whether or not the act of the Governor, in directing the then acting Director of Public Works and Buildings to reject the bids for cement, under the circumstances disclosed by the record, was an official, public, general and authorized act of the Governor as the head of the Executive Department of our State Government. The *O'Keefe* and the *Madison Construction Company cases* clearly hold that it was such an official act, an act performed for the public welfare which precludes the claimant from recovering notwithstanding the fact that he suffered damage.

Furthermore the statutes of the State of Illinois (Ch. 121, Sec. 30, Ill. Rev. Statutes 1945) provide that the Department of Public Works and Buildings "may reject any or all proposals, and may at once advertise for new proposals as hereinbefore provided, if in its opinion the best interests of the State will thereby be promoted." The Department of Public Works and Buildings is established by legislative enactment; its Director is appointed by the Governor; it is essentially a division or arm of the Executive Department. Article V, Section 6, of the Illinois Constitution provides that the supreme executive power shall be vested in the Governor, "who shall take care that the laws be faithfully executed."

When the Director of Department of Public Works and Buildings, after conference with the Governor, and presentation of the facts in relation to the bids received in February and March, 1933, recommended the rejection of such bids, and the Governor directed him to reject the same, the Governor was discharging his constitutional duties in the enforcement of this statute.

The validity and the propriety of the Governor's

action is not to be tested by anything more than the facts then confronting him. Subsequent events or judicial determination of the innocence or culpability of cement manufacturers does not constitute the criterion as to the legality for his action. The Federal Trade Commission later did make a finding that the cement manufacturers in question were guilty of a conspiracy, and although the Circuit Court of Appeals subsequently reversed that finding, a perusal of the opinion in that case reveals the complexity of the problem involved. The accuracy of this observation is further confirmed by the Supreme Court in issuing its writ of certiorari to review that record. Obviously the Governor can not be required to act with judicial deliberation and exactitude under such circumstances. This court is not called upon in this case to pass upon the merits of the controversy involving the cement producers. The Governor at the time acted within his constitutional power in rejecting proposals to promote the best interest of the State, as he saw it, in good faith.

Despite the persuasive and extensive briefs and arguments, and despite the urging of claimants that the *O'Keefe* and the *Madison Construction Company cases* are not controlling here, and if controlling should be overruled, this court is of the opinion that the principle followed in those cases is correct. The decisions in those cases are reaffirmed, and found to be controlling here.

Although we have discussed at considerable length the applicability of the *O'Keefe* and the *Madison Construction cases,* aside from the principle of those cases, and aside from any question of the power of the sovereign to act as in this case, an award would not be possible. The contracts in question contained the Standard Specifications for Road and Bridge Construction of the

Division of Highways, adopted January 2, 1932. Section 6.6 of those Specifications states: ''The Department will furnish the portland cement.'' Section 6.6 (a) (3) states: ''The Department assumes no responsibility for the delivery of the cement at the time desired, nor will extra compensation be allowed the Contractor for the non-delivery of the same when required.'' In Section 4.3 of the specifications, the Department reserves the right to alter the quantities of work to be performed or to extend or shorten the work, provided the total price for all such alterations, extensions, or deductions does not exceed 25% of the original contract price. In Section 4.4 the Department also reserves the right to make such changes in the plans and in the character of the work as may be necessary or desirable to insure completion in the most satisfactory manner, provided such changes do not materially alter the original plans and specifications.

The case of *U. S.* v. *Foley,* U. S. 91 L. ed. 135, reached the Supreme Court on certiorari to review a judgment against the Federal Government upon a claim by an electrical contractor for damages occasioned by delay in making available certain airport runways upon which his work was to be done. The majority opinion in that case reversed the Court of Claims, and much of what was said in that opinion is applicable to the contractual provisions above quoted. The Supreme Court there said:

"In no single word, clause, or sentence in the contract does the Government expressly covenant to make the runways available to respondent at any particular time. Cf. *United States* v. *Blair,* 321 U. S. 730, 733, 734, 88 L. Ed. 1039, 1042, 1043, 64 S. Ct. 820. It is suggested that the obligation of respondent to complete the job in 120 days can be inverted into a promise by the Government not to cause performance to be delayed beyond that time by its negligence. But even if this provision standing alone could be stretched to mean that the Government obligated itself to exercise the highest degree of diligence and the utmost good faith in efforts to make the runways promptly available, the facts of this case would show no breach of such an undertaking.

For the Court of Claims found that the Government's representatives did this work 'with great, if not unusual, diligence,' and that 'no fault is or can be attributed to them.' Consequently, the Government cannot be held liable unless the contract can be interpreted to imply an unqualified warranty to make the runways promptly available.

"We can find no such warranty if we are to be consistent with our Crook and Rice decisions (WS) *supra*. The pertinent provisions in the instant contract are, in every respect here material, substantially the same as those which were held in the former cases to impose no obligation on the Government to pay damages for delay. Here, as in the former cases, there are several contract provisions which showed that the parties not only anticipated that the Government might not finish its work as originally planned, but also provided in advance to protect the contractor from the consequences of such governmental delay, should it occur. The contract reserved a governmental right to make changes in the work which might cause interruption and delay, required respondent to coordinate his work with the other work being done on the site, and clearly contemplated that he would take up his work in the runway sections as they were intermittently completed and paved."

Even if it may be said that the provision of Section 6.6 (a) (3), absolving respondent of any responsibility for non-delivery of cement when required, contemplated only delays by the mill or in transportation, there is no express provision elsewhere in the specifications whereby the Department covenanted or warranted to furnish the cement at any particular time. In the absence of any such express warranty, and in view of Sec. 6.6 (a) (3), and the other quoted provisions, which contemplated the possibility of delays on the part of respondent, the situation disclosed by this record invokes the rule enunciated in the *Foley* case and precludes claimant from an award.

For the reasons stated, the claim is, therefore, denied.